THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID PARKER, Defendant-Appellant.

Fifth District No. 5—91—0115

Opinion filed September 25, 1992.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of St. Clair County, defendant David Parker was convicted of murder, armed violence, attempted murder and aggravated battery. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), 33A—2, 8—4(a), 12—4(a).) Defendant was sentenced to a 30-year term of imprisonment for murder, to be served concurrently with terms of imprisonment of 10 years for armed violence, 15 years for attempted murder and five years for aggravated battery. On appeal, defendant presents 10 issues for this court's review. We believe one issue to be dispositive: whether defendant was proved guilty beyond a reasonable doubt where the only evidence against him con-

sisted of the prior inconsistent statements of three State's witnesses which were disavowed by the witnesses at trial.

Initially, we note that a criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Nitz* (1991), 143 Ill. 2d 82, 95, 572 N.E.2d 895, 900, *cert. denied* (1991), 502 U.S. 927, 116 L. Ed. 2d 283, 112 S. Ct. 344.) The relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) When presented with a challenge to the sufficiency of the evidence, it is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses. If, after such consideration, the reviewing court is of the opinion that the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged, then the conviction must be reversed. (*Young*, 128 Ill. 2d at 48, 538 N.E.2d at 472.) Given these principles, and based upon a careful review of the record herein, we do not believe that the evidence presented by the State was sufficient to remove all reasonable doubt or create an abiding conviction of defendant's guilt.

Testimony at trial revealed that between 1 and 2:30 a.m. on March 10, 1986, near Haymore's Liquor Store and Pool Hall (Haymore's) in East St. Louis, Illinois, Prentis Reid was fatally wounded by a single gunshot which perforated his aorta. Lee Wiley, Jr., also was shot, receiving a bullet wound in the neck. Defendant was sought in connection with the crimes but could not be located for some time.[1] Defendant's trial was held on December 19 and 20, 1990.

Detective Walter Boone of the East St. Louis police department testified that he took a written statement from Lee Wiley, Jr., on March 17, 1986, at St. Louis University Hospital. Wiley's statement, People's exhibit 1, which was admitted over defendant's objection, read as follows:

"I was at Lois Tucker's house drinking some beer at around 10:15 p.m.. I walked up to Haymore's to get some cigarettes

---

[1]The record reveals that defendant waived extradition from California and first appeared in St. Clair County circuit court to answer these charges on August 24, 1990.

and I saw Rondey [*sic*] Spears, David James and Marcus Williams and Dave Parker standing along side of Haymore's. I have known David Parker for about 10 years. My brother in law Printess [*sic*] Reid came walking up and Dave Parker for no reason at all went off on him calling him a fag and punks and what was he going to do. Prentiss [*sic*] did not say anything and started backing up and David was walking towards him. David pulled out a black looking gun and Marcus said to David to slow down and I told David to 'cool out Dave,' David told me 'nigger shut up' and then David turned and shot me in my neck and I fell to the ground. That is about all I remember because I passed out. David did not like Prentiss [*sic*] because David was suppose [*sic*] to be the king of dice and about 4 yrs. ago Prentiss [*sic*] broke David at a dice game and David hasn't liked him since. I did not see anyone else with a gun nor did I have one. I do remember that after I was shot, I saw Dave Parker walk past me with the gun, towards Prentiss [*sic*] and said, 'What you want now.' That's when I passed out."

Detective Boone testified that on March 17, 1986, Wiley was alert, responsive and able to talk to him. Boone admitted, however, that he did not ask the doctors or nurses about the type of medication Wiley was receiving. Boone wrote down the statement that Wiley gave and handed it to Wiley, who "appeared to be reading it" before he signed it. Boone testified that he showed Wiley 58 photographs on March 11, 1986, and asked Wiley to pick out the person who shot him. Wiley, who was unable to speak at that time, nodded when he was shown the photograph of defendant.

Lee Wiley, Jr., testified that he was currently serving a 22-year prison sentence in Missouri for first-degree robbery. Wiley stated that he did not see anyone shot at Haymore's on March 10, 1986, nor did he see who shot him, adding: "I just remember a lot of people across the street. I remember some people behind me, some people by the pool room door. I heard a gunshot and felt a gunshot, and I was out." Wiley remembered seeing defendant earlier that evening, but not immediately prior to the shooting. When asked if he understood that defendant was being charged with attempting to murder him, Wiley replied, "Yes," but when asked if defendant had shot him, Wiley replied, "No. If he did, I would want him to be doing time like me ***."

Wiley testified that he was shown a group of photographs by Detective Boone and identified defendant as being one of the people at the scene. Wiley admitted giving a statement to Detective Boone while he was in the hospital, and that he had been given an opportu-

nity to read the statement and had signed it. However, Wiley denied telling Detective Boone that defendant had shot him or that he had seen defendant with a gun. Wiley stated that he was in the hospital for 2½ months and that he had signed the statement only seven days after being admitted, while still recovering from surgery and in great pain: "I had tubes all over my body. I could not move. Like I said, I did not want to be bothered. *** I had tubes in my mouth, tubes in my nose, tubes everywhere in my body, even to use the bathroom." Wiley stated that he signed the statement "to get [Boone] out of the hospital room with all those questions."

Detective Lenzi Stewart of the East St. Louis police department testified that he took a statement at the East St. Louis police station from Tommy Coleman on March 10, 1986. Stewart stated that he interviewed Coleman because he had read an offense report in which Coleman was listed as a witness. Coleman's statement, People's exhibit 2, was admitted over defendant's objection and ·stated in pertinent part:

"On Sun., Mar. 10, 1986 at approximately 1:00 AM or so, I had just walked out of the Haymore's Liquor store and Variety store, located at 15th and Lynch Av. [sic] in East St. Louis, Il. when I saw David Parker saying something to Steve Folks, Lee Wiley and Pretis [sic] Reid, who were standing next to the roadway just west of the alley next to the Haymore's Pool room. I was approximately ten feet behind (east) David and the others and could not hear what David said to the three guys. Immediately after David said what he had said to the guys, David reached under his the [sic] dark jacket that he had on and pulled out a weapon, which sounded like an automatic type. When David pulled the weapon, which was black in color, he pointed it at Lee Wiley and fired the weapon. Lee fell to the ground. Steve and Prentis took off running. Steve ran down the alley behind Haymore's Pool Room north bound. Prentis ran across to the street and down the same alley, south bound. David ran after Prentis. While David was running after Prentis, he fired the weapon at Prentis at least two times. David fired the weapon at least four times prior to running after Prentis. When I saw what was happening, I ran back towards Haymore's. I stayed in the area until the police arrived. I saw Lee laying [sic] on the ground bleeding. I did not get a chance to talk with Lee."

Detective Stewart testified that when he finished questioning Coleman, a three-page statement was prepared. Coleman was given the

opportunity to read this statement before he signed it. Stewart denied telling Coleman that he would be arrested or prosecuted for withholding evidence if he refused to sign the statement.

Tommy Coleman testified that he was not at Haymore's on the night of the shootings. Coleman stated that he did not know defendant and denied telling Detective Stewart that defendant shot Wiley and Reid. Coleman testified that Detective Stewart and several other officers came to his home with a prepared statement and told him that if he did not sign it he would be arrested for withholding information, "because somebody put me at the scene of the crime." Coleman stated that he signed the statement because at the time he was 17 years old and had just been released from the juvenile Department of Corrections, and this threat frightened him. Coleman stated that he was currently serving the third year of a prison sentence for "[a]ccountability of stickup murder."

Detective Stewart was recalled and testified that he took a statement from William David James on March 11, 1986, at the East St. Louis police station. James' statement, People's exhibit 10, was admitted without objection. The statement indicated that James was inside Haymore's playing pool when he heard two shots, then a series of shots. Several minutes later, someone ran to the front door of the pool room and shouted that Lee Wiley had been shot. James ran outside and saw Wiley lying on the ground and bleeding from his neck area. James saw defendant and two other people standing over Wiley. After the ambulance took Wiley away, defendant asked James for a ride home. Defendant told James that Ricky Carter had driven by in a Cadillac and started shooting at him, but that Wiley "took the bullet." After defendant was taken home, James met Rodney Spears, who told him that "Prentis Reid was laying [sic] back in the alley dead." James went to the alley across the street from Haymore's and saw Reid "laying [sic] across some tree branches." While Spears was searching Reid's pockets, the police arrived, took Spears' and James' names and addresses and told them they could go.

According to James' statement, when Stewart asked him if he had seen defendant earlier that evening, James replied: "Yes, he was in the Projects, at Marcus's house with us. He and J.C. rode to pool room together. I lied earlier and didn't mention [defendant's] name, because I am afraid of him." The statement further related that when Stewart asked James if he had known the defendant was armed, James responded: "Yes. When we were in the Projects, Marcus's house, I saw the handle sticking out of his waistband ***." Stewart testified that at the time James' statement was taken, no one was

present except him and James. The statement was typed as James was telling it, and he then reviewed it and signed it. Stewart denied having beaten or coerced James into giving the statement but admitted that he had told James that he could be charged with "robbing the dead."

At trial, William David James testified that the statement given to police was falsified and that the police had beaten him and forced him to sign the statement. James testified that he was outside Haymore's on March 10 when "a car came by and started shooting." He did not see the driver of the car but stated that defendant was in the liquor store when Wiley and Reid were shot. James testified that about an hour after the shooting, the police stopped him near Prentis Reid's body but only held him for five minutes. James stated that two days later the police came and picked him up and threatened to jail him for robbing the dead. James further stated that he told the police about the car that drove by Haymore's and started shooting, but that he did not know what else to say to them because it was an unknown car and he could give them no further information. James stated that he was arrested at 1 o'clock and was released at 5 o'clock that evening after being beaten by Detective Stewart and forced to make a statement against defendant.[2] James denied telling Stewart that he was afraid of defendant or that defendant was armed on the night of the shooting.

Tommy Williams, the doorman at Haymore's, testified that he saw defendant at Haymore's near the time of the gunfire. Williams stated that when he searched defendant earlier that night, "I might have felt—felt like something on him, you know. It might have been a weapon. I don't know for sure." Williams went outside Haymore's "a minute or so" after the final shots were fired and saw defendant with Wiley. Defendant told Williams' wife, a nurse, to "save" Wiley. Williams stated that he had seen Wiley fighting with someone within "a couple hours" of when Wiley was shot, but that it was not defendant.

Yolanda Wiley, the sister of Lee Wiley, Jr., testified that her brother had told her he had received anonymous letters which threatened their family. Yolanda stated that Wiley told her, "I'm worried about mama and yaw [sic] and that I wouldn't be testifying. If I did, I wouldn't remember—I wouldn't be knowing what to say or I just might not testify at all because I was scared." Yolanda admitted that

---

[2]People's exhibit 10 shows that James' interview was begun at 1:55 p.m. and completed at 5:30 p.m. on March 11, 1986.

she was "going with" Prentis Reid at the time of his death. Yolanda had not seen any of the letters and did not know from whom they came.

Lee Wiley, Jr., was called as a witness on behalf of defendant and testified that although he had spoken to his sister Yolanda on the telephone from the St. Clair County jail the previous week, he did not tell her that he had received threatening notes. Harry Seper, chief investigator for the St. Clair County public defender's office, testified that he had interviewed Wiley at the jail that week. Seper stated that Wiley told him he did not know who shot him, but that it was not defendant. Wiley told Seper that he did not want to testify but gave no indication that he had received threats to dissuade him.

In *People v. Wise* (1990), 205 Ill. App. 3d 1097, 563 N.E.2d 1057, the victim testified that while he was in a sandwich shop, the defendant came from behind him and grabbed him in a bear hug. At the same time, Edgar Jones walked up to the victim, pulled a gold chain with a medallion from around the victim's neck and struck him in the eye. Two police officers arrived, and the defendant and Jones fled. The police apprehended the defendant and Jones and brought them back to the sandwich shop. However, the victim had left. It was not until two detectives located the victim the next day that he indicated he had been robbed and identified photographs of the defendant and Jones. The defendant was then charged with aggravated battery and robbery.

Following a jury trial, the defendant in *Wise* was granted a directed verdict on the aggravated battery count and was found guilty of robbery on an accountability theory. On appeal, the defendant claimed that there was insufficient evidence to establish his guilt beyond a reasonable doubt. The *Wise* court agreed and reversed the defendant's conviction on the grounds that the only evidence as to the defendant's involvement in the robbery was the inconsistent testimony of the victim, who had been impeached by prior statements he had made exonerating the defendant from any complicity in the robbery. The court in *Wise* commented:

> "The State repeatedly cites in its argument the proposition that discrepancies in testimony do not destroy credibility and that the testimony of a single witness, if positive and credible, even if contradicted, is sufficient to support a conviction. [Citations.] While these statements are undoubtedly true, they are not applicable to this case since in this case the single accusing witness' testimony did not merely contain minor discrepancies. Instead, it was severely impeached by evidence of his own in-

consistent statements concerning the robbery and defendant's participation in it, thereby greatly reducing the credibility of [the victim's] trial testimony. In light of this fact, and the lack of any corroborative evidence, we find [the victim's] trial testimony insufficient." *Wise*, 205 Ill. App. 3d at 1101, 563 N.E.2d at 1060.

In the case at bar, the sole evidence of guilt consisted of the prior inconsistent statements of Wiley, Coleman and James, admitted pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, pars. 115—10.1(a), (b), (c)(2)(A)). These statements, however, were severely impeached by the witnesses' trial testimony, which exculpated defendant and cast doubt on the authenticity of the statements. Therefore, where the only evidence that inculpated defendant was prior inconsistent statements which were directly contradicted by the alleged declarents at trial, the credibility of this evidence was greatly reduced. This lack of credible eyewitness testimony in favor of the State, combined with the complete absence of any physical evidence tying defendant to the crime, prompts us to find, as the court did in *Wise*, that the evidence presented was insufficient to sustain defendant's convictions. See *People v. McCarthy* (1981), 102 Ill. App. 3d 519, 430 N.E.2d 135 (testimony of State's witnesses and discrepancies therein raised a reasonable doubt concerning incident giving rise to charges against defendant and therefore evidence was not sufficient to support conviction for aggravated battery).

The State argues that the present case is similar to *People v. McBounds* (1989), 182 Ill. App. 3d 1002, 536 N.E.2d 1225, in which the reviewing court held that where the trial court found section 115—10.1 out-of-court statements more trustworthy than those witnesses' trial testimony, it was not improper to credit the statements substantively so as to find sufficient evidence to convict beyond a reasonable doubt. In *McBounds*, two of the State's witnesses, who had earlier given statements to police inculpating the defendant, testified at trial that their statements were coerced and that they had witnessed nothing which would incriminate the defendant. However, in *McBounds*, unlike the instant case, there was sufficient evidence to support the trier of fact's finding that the witnesses' prior statements were not coerced and were voluntary, where an investigator testified that he did not find any evidence to support the witnesses' claims of abuse by police. Here, although Detectives Stewart and Boone denied the witnesses' claims that their statements were falsified, there is no evidence that an independent investigation of their claims was under-

taken. Additionally, although Yolanda Wiley testified that her brother had told her he was receiving threatening letters and was afraid to testify, this testimony was hearsay and should not have been admitted. See *People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169, *cert. denied* (1980), 446 U.S. 940, 64 L. Ed. 2d 794, 100 S. Ct. 2162 (prior inconsistent hearsay statements of an in-court witness cannot be used as substantive evidence).

Further, as the State admitted in oral argument, the instant case also differs from *McBounds* because there the prosecution's entire case did not rest on disavowed prior inconsistent statements. (*McBounds*, 182 Ill. App. 3d at 1005-07, 536 N.E.2d at 1228-29.) Even when viewing the evidence in the light most favorable to the prosecution, we find the State has failed to prove beyond a reasonable doubt that defendant committed the charged offenses. We therefore reverse defendant's convictions for murder, attempted murder, armed violence and aggravated battery.

Reversed.

GOLDENHERSH, P.J., and RARICK, J., concur.