FOURTH DIVISION
November 21, 2007

No. 1-05-3436

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04 CR 283 |
| | ) | |
| QUENTIN COX, | ) | |
| | ) | Honorable Lawrence P. Fox, |
| Defendant-Appellant. | ) | Judge Presiding |

Justice Murphy delivered the opinion of the court:

Defendant, Quentin Cox, was convicted of first-degree murder after a jury trial and sentenced to 40 years' imprisonment for the murder and a 25-year enhancement for personally discharging a firearm. On appeal, defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt because the identification evidence was unreliable; (2) the State improperly bolstered identification testimony by introducing hearsay; (3) the State made an argument in closing that was unsupported by the evidence; and (4) his sentence is excessive. For the reasons that follow, we affirm.

## I. BACKGROUND

On October 3, 2003, 17-year-old James Davis died from a single gunshot wound to the back. Defendant was charged with first-degree murder, and four occurrence witnesses testified at his trial: Clifford Jones, Jeremy Jones, Dominique Bullitt, and Charles Lewis.

A. Clifford Jones

Clifford Jones testified that on October 3, 2003, he planned to attend a high-school football game with his brother, Jeremy Jones, and his cousin, James Davis. Just before 7 p.m., when the streetlights were on, he left his grandmother's house at 99th and Charles to pick up his friend Lance Flowers, whose house was on the next block at 99th and Malta. When he arrived at 99th and Malta, he saw a man walking toward him on 99th Street, across from Beverly, which was located one "house yard" further down. Although it was warm out, the man was wearing a jacket and a skull cap with a red symbol on the front. Clifford identified the man in court as defendant.

After Clifford picked up Lance, he saw defendant for a second time at 99th and Beverly. Defendant crossed the street with his hand in his coat, then pulled out a gun and started waving it around. At that time, Dominique Bullitt, Kelly, and Charles Lewis turned the corner and began to run away. When defendant began running toward Clifford and his group, they turned and ran. Clifford turned into an alley, heard two shots, and ran to his grandmother's house. Neither James nor Jeremy had returned to his grandmother's, so he went back to 99th Street, where he discovered his cousin being put into an ambulance.

Clifford testified that on the night of the shooting, he described the shooter to the police as 17 or 18 years old, 5 feet 7 inches, 150 pounds, and dark-skinned, wearing a black jacket, black hat, black pants, and white shirt. The next morning, the police showed Clifford a black-and-white

photo array, but he told the police that the shooter was not in the array.[1]

On October 20, 2003, the police showed Clifford a color photo array containing six pictures. He picked out the second picture as the person that was the "most similar" to the shooter, but told the police he would need to see him in person or in a lineup. The "most similar" person turned out not to be defendant, who was pictured in the third photo of the array. However, Clifford testified that the photo was too dark and he could "not really" see defendant's face. At trial, he still could not decipher whether the third photo pictured defendant because it is "black on black." Clifford's older brother, Jeremy, was present when he viewed the photo array and also had an opportunity to view it, but Jeremy identified someone else.

On December 1, 2003, Clifford went with his brother to the police station to view a lineup. He sat in a room with his mother and a detective, who told him that the shooter may or may not be in the lineup. He identified defendant, "no. 4 in lineup," as the shooter. After viewing the lineup, he went into a different, bigger room, which contained a television. He denied talking to anyone else before the lineup or telling anyone that day whom to pick out of the lineup.

### B. Jeremy Jones

Jeremy Jones testified that on October 3, 2003, at 7 p.m., he, Clifford, and James walked from his grandmother's to Lance Flowers's house in anticipation of going to a football game. The streetlights were on but it was not yet dark. On the way, he noticed a man two or three houses from Beverly who was wearing a black jacket and skullcap with a red logo and walking toward

---

[1] Pretrial proceedings revealed that this photo array was not inventoried. The police reproduced three of the pictures that were used in the array, but defendant's photo was not included in the attempted reproduction.

them. Jeremy identified the man in court as defendant. Jeremy found defendant's attire unusual because it was hot out and he was wearing shorts and a short-sleeved shirt. They went to Lance's house, and when they got to the intersection of Malta and Beverly, he saw defendant at the corner of 99th and Beverly, walking in the middle of the intersection with his hand in his pocket. He pulled a long, silver revolver out of his jacket pocket, waved it in the air, and pointed it at Jeremy's group.

Jeremy noticed Dominique, Charles, and Kelly turn the corner at the intersection of 99th and Beverly and start running toward him. When defendant began following Dominique, Charles, and Kelly, Jeremy and his group also began to run. As he was running, he looked back to see that defendant stopped running and began firing the gun. When Jeremy arrived at the alley between Malta and Charles, he turned around and saw his cousin falling to the ground and defendant running in the opposite direction.

The night of the shooting, Jeremy talked to the police and described the shooter as a black, dark-skinned male between 17 and 18 years old who weighed about 155 pounds and was wearing a quilt jacket with white lining, black pants, a black skullcap with a red emblem, and a white T-shirt. He testified that he did not give the police an exact height; however, Detective Alejandro Almazan, a Chicago police detective, interviewed Jeremy Jones on the night of the shooting and testified that Jeremy described the shooter as weighing approximately 155 pounds.

The next morning, Jeremy viewed an array of four black-and-white photos. He was unable to identify the shooter from the photos, but he did identify someone who "had a similar face to the shooter." The person he identified as looking similar to the shooter was not defendant.

On October 20, 2003, when the police showed him a color photo array, he identified defendant but told the police he would need to see him in person. He denied discussing the photo array with his brother.

On December 1, 2003, Jeremy went to the police station to view a lineup. He was placed in a small room with his mother and brother. Clifford left the room to view the lineup first, then Jeremy went. Jeremy identified defendant and told the detective "that was the guy, unless he had a twin brother." Jeremy denied speaking to Clifford between the time Clifford left to view the lineup and when Jeremy left to view the lineup. After viewing the lineup, he was placed with his brother in a different room containing a television. There, he saw Charles Lewis, Dominique Bullitt, and Lance Flowers. The five discussed that they were there to view a lineup but did not discuss whom they picked out.

### C. Dominique Bullitt

Dominique Bullitt testified that on October 3, 2003, at 7 p.m., he was at a bus stop on the corner of 99th and Beverly Street, near his home. It was getting dark, but the streetlights were not on yet. He was with Charles Lewis and Kelly, whose last name he did not know. While they were standing at the bus stop, a man wearing a black jacket and black hat approached them from the east. The man was approximately 15 feet away when he reached into his coat and withdrew a silver handgun and aimed it in their direction. Dominique moved behind a tree, and when he saw the man walk down the street a little, the three ran toward Charles Street. He encountered Jeremy Jones, Clifford Jones, and James Davis on 99th and Malta, and that group also started running toward Charles Street. He heard about three gunshots from behind, so he turned into an

alley and waited there until the gunshots stopped. When he returned to 99th Street, he found James Davis on the ground.

Dominique did not speak to the police until they sought him out a couple of weeks after the shooting. He testified that he told the police that he was not present at the time of the shooting.

Dominique testified at trial that he had not seen the gunman's face. However, he admitted that on December 18, 2003, he testified before a grand jury, where he identified defendant as the gunman. He further admitted that he identified defendant in the lineup that occurred on December 1, 2003. He testified at trial that while waiting to view the lineup, he spoke with Charles, Clifford, Jeremy, and Lance. When Charles returned to the conference room that they were in, he told Dominique that he had identified the person standing in position number 4. Dominique thought Clifford also said that number 4 was the shooter. Dominique identified the same person because others picked him out, even though he did not see the gunman's face on the night of the shooting. He testified that he further identified defendant at the grand jury because it was the same man he had identified in the lineup.

Dominique admitted that he was arrested for failing to appear at court for this case.

### D. Charles Lewis

Charles Lewis testified that on October 3, 2003, at 7 p.m., he was at the bus stop at 99th and Beverly talking to his cousin Kelly and Dominique Bullitt. He saw a man with a gun and began running; as he ran, he heard gunshots. When he got to his house, someone called him on his cellular phone and told him that Little James was on the ground, so he ran outside the house,

where he found the victim. Although Charles identified defendant at the lineup on December 1, 2003, and before the grand jury on December 11, 2003, he testified at trial that he did not see the shooter's face. He also testified that he does not have good eyesight and he "didn't even have glasses at this time."

Charles testified at trial that the police harassed him into viewing the lineup and appearing before the grand jury; however, his grand jury testimony was that he was treated well and no threats or promises were made. In addition, he was out on bond because a warrant had been issued for his failure to appear for an earlier court date for this case pursuant to subpoena. His family still lived at 99th and Charles, and he received mail there but was not there on a day-to-day basis.

He testified that before the lineup, police detectives showed him a picture of defendant. He identified defendant in the lineup because other witnesses said that the person in position number 4 was the shooter.

### E. Detective Timothy Bagdon

Detective Timothy Bagdon was a police detective assigned to investigate the shooting. He testified that when Clifford and Jeremy arrived at the police station on December 1, 2003, they were placed in a back room with their mother, separate from Dominique, Charles, and Lance, who were in a different room, which contained vending machines.

Each of the witnesses viewed the December 1 lineup separately. Clifford first viewed the lineup and returned to the room, then Jeremy did the same. Next, Charles individually viewed the lineup and went to the television room, and the process was repeated for Dominique and Lance

Flowers. All five witnesses identified defendant, who was in position number 4, as the shooter. After 10 or 15 minutes, Jeremy, Clifford, and their mother went to the television room to wait for the assistant State's Attorneys.

### F. Detective Sylvia Van Witzenburg

Detective Sylvia Van Witzenburg was present when each of the witnesses viewed the lineup. She testified that Jeremy and Clifford's mother was with each of them when they viewed the lineup, but she did not tell either boy whom to pick.

### G. Conviction and Sentencing

The jury found defendant guilty of first-degree murder. After hearing arguments, the trial court sentenced defendant to 40 years' imprisonment for the murder and an enhancement of 25 years for personally discharging a firearm. This appeal followed.

### II. ANALYSIS

### A. Sufficiency of Identification Evidence

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because the identification evidence was unreliable when two of the four occurrence witnesses identified someone other than defendant in photo arrays before identifying him in a lineup, and the other two denied at trial that they saw the shooter's face.

"It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt." *People v. Frieberg*, 147 Ill. 2d 326, 359 (1992). When a defendant challenges the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the

1-05-3436

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). A court of review will not overturn the fact finder's verdict unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt as to the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

The prosecution has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "A single witness's identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307. However, an identification will be insufficient to support a conviction if it is vague and doubtful. *Slim*, 127 Ill. 2d at 307. The reliability of a witness's identification of a defendant is a question for the jury. *People v. Cosme*, 247 Ill. App. 3d 420, 428 (1993). Furthermore, it is the function of the jury, as the trier of fact, to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). The jury must also resolve conflicts or inconsistencies in the evidence. *Tenney*, 205 Ill. 2d at 428.

Circumstances to be considered in evaluating an identification include the following: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Slim*, 127 Ill. 2d at 307-08.

Defendant contends that there was little opportunity to view the offender at the time of the shooting because it was dark out and the witnesses were running. However, Jeremy and Clifford testified that they saw defendant not only before the shooting, but also a few minutes earlier, when they were on their way to Lance's house. Although Jeremy and Clifford may not have seen defendant for an extended period of time, they saw him long enough the first time to note his unseasonable attire, distinctive hat, and location. They saw him long enough the second time to observe that defendant put his hand in his coat, pulled out a gun, and began waving it around. This court has previously rejected claims that the brevity of a witness's description undermines his identification testimony. *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006); *People v. Negron*, 297 Ill. App. 3d 519, 531 (1998). Furthermore, their ability to describe the shooter refutes defendant's argument that Jeremy and Clifford were not close enough to make an accurate identification of the shooter because Clifford described their distance from the shooter as "one house yard" away.

In addition, Jeremy, Clifford, and even Dominique testified that it was not dark out yet. Even if it had been dark, we have held that testimony based on night observations illuminated only by artificial light may serve as proof of identification beyond a reasonable doubt. *Barnes*, 364 Ill. App. 3d at 894.

Defendant also claims that Jeremy's and Clifford's previous descriptions of defendant diminished the reliability of their identifications. Clifford testified that he described the shooter to the police as 17 or 18 years old, 5 feet 7 inches, 150 pounds, and dark-skinned, wearing a black jacket, black hat, black pants, and white shirt. The night of the shooting, Jeremy described the

shooter as a black, dark-skinned male between 17 and 18 years old who weighed about 155 pounds and was wearing a quilt jacket with white lining, black pants, a black skull cap with a red emblem, and a white T-shirt. He testified that he did not give the police an exact height; however, Detective Almazan testified that Jeremy described the shooter as being 5' 10". Defendant argues that he is "much shorter." To the extent that defendant is in fact "much shorter" than 5' 10", it should be noted that "[c]onsidering that very few persons are trained or keen observers and considering the stress under which, in criminal cases particularly, impressions of witnesses have been formed, discrepancies of this character are not uncommon." *Slim*, 127 Ill. 2d at 311. See also *People v. Curtis*, 262 Ill. App. 3d 876, 881 (1994) (although the witness described the defendant as 5 feet 8 inches to 6 feet and 150 pounds when in fact he was 5 feet 4 inches and 135 pounds, identification was not unreliable). Jeremy and Clifford were able to provide specific details about defendant's clothing and appearance, and any discrepancies as to height or weight do not render their identifications unreliable. See *Slim*, 127 Ill. 2d at 312.

Defendant contends that the only witness to "express any certainty" about his identification was Jeremy. To the contrary, Clifford unequivocally identified defendant at the lineup. In addition, Jeremy told the police that defendant was the shooter "unless he had a twin brother."

Defendant, however, relies on Clifford's and Jeremy's uncertainty during the two photo arrays. Neither was able to identify anyone in the first, black-and-white photo array, although Jeremy pointed out someone who looked similar to the shooter. The police did not inventory this photo array, and only three photos, none of which was defendant's, could be obtained when the

police attempted to reconstruct it. The record is unclear as to whether defendant's picture was even included in the first photo array.

When he viewed the second, color photo array, Jeremy identified defendant but told the police he would need to see him in person. Clifford picked out someone who looked the "most similar" to the shooter; however, the picture was not of defendant. Clifford testified that the photo was too dark and he could "not really" see defendant's face. At trial, he still could not tell whether the third photo pictured defendant because it was "black on black." The picture of defendant in the color photo array does indeed have a dark background as well as a dark shading over the entire picture, which renders an identification difficult. Furthermore, although Jeremy and Clifford each pointed out people who were not defendant in the first and second photo arrays, respectively, it is significant that they only pointed out people who looked *similar* to the shooter; Jeremy and Clifford did not state that they identified the shooter himself.

As for the final factor, the length of time between the crime and the confrontation, the lineup occurred two months after the shooting. Where two-year lapses of time between the crime and the identification have been upheld (*Slim*, 127 Ill. 2d at 313-14; *People v. Wardell*, 230 Ill. App. 3d 1093, 1098 (1992)), the passage of two months between the date of the crime and the date of the lineup does not adversely affect the identification. While defendant suggests that the reliability of the lineup identifications is questionable since the lineup occurred after the failed identifications at the photo arrays, we found in *Curtis* that lineups "from which the defendant is identified as the perpetrator are not rendered inadequate merely because the defendant is the only person in the lineup whose photograph was previously shown to the person viewing the lineup."

1-05-3436

*Curtis*, 262 Ill. App. 3d at 883-84.

Dominique and Charles also identified defendant at the lineup and before the grand jury. At trial, they disavowed those identifications[2] and claimed that they never saw the shooter's face. Charles testified that he did not have good eyesight, that the police harassed him into viewing the lineup and appearing before the grand jury, and that police detectives showed him a picture of defendant before the lineup. Defendant also suggests that the lineup was suggestive because witnesses told each other which subject to choose. We note, however, that the police, Jeremy, and Clifford testified that everyone viewed the lineup separately and the witnesses did not have an opportunity to tell each other whom to choose. In addition, both Charles and Dominique had been arrested for failing to appear for court for this case pursuant to subpoena.

Defendant, citing *People v. Arcos*, 282 Ill. App. 3d 870 (1996), and *People v. Parker*, 234 Ill. App. 3d 273 (1992), argues that because Charles and Dominique disavowed their earlier testimony, the court must look to corroborative evidence to support the conviction. In *Parker*, the defendant's conviction was reversed because the prior inconsistent statements of three recanting witnesses were the only evidence against the defendant and the statements were so seriously impeached at his trial as to case doubt on their authenticity. *Parker*, 234 Ill. App. 3d at 280. In *Arcos*, the trial judge erred in a bench trial when he convicted the defendant despite finding that the sole witness, who recanted his earlier statements, was a " 'thoroughly disreputable person who cannot be believed.' " *Arcos*, 282 Ill. App. 3d at 871. On appeal, the court

---

[2] Defendant does not take issue with the admissibility of Charles's and Dominique's prior inconsistent statements.

-13-

concluded that, in light of the trial judge's assessment of the witness, corroborating evidence would be required to remove all reasonable doubt of the defendant's guilt. *Arcos*, 282 Ill. App. 3d at 876.

Here there is testimony from two additional eyewitnesses, who identified defendant in a lineup and at trial. Furthermore, this court has since held that recanted prior inconsistent statements can be sufficient to support a conviction, even without corroborating evidence. *People v. Thomas*, 354 Ill. App. 3d 868, 880 (2004); *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002); *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998). By its verdict, the jury determined that Charles and Dominique were telling the truth when they testified before the grand jury and were lying at trial. *People v. Morrow*, 303 Ill. App. 3d 671, 676-77 (1999).

Considering the evidence in the light most favorable to the State, we conclude that the eyewitness testimony in this case is sufficient to uphold defendant's conviction.

### B. Hearsay Testimony

Defendant next contends that the State improperly bolstered the identification testimony of its witnesses by introducing hearsay evidence that Lance Flowers identified defendant as the shooter and that an elderly woman named Dorothy identified defendant as the shooter in a phone call to police.

Hearsay evidence, an out-of-court statement offered to establish the truth of the matter asserted, is generally inadmissible unless an exception applies. *People v. Sullivan*, 366 Ill. App. 3d 770, 779 (2006). "The problem with hearsay evidence is that the defendant has no opportunity to cross-examine the declarant." *Sullivan*, 366 Ill. App. 3d at 779. Inadmissible hearsay exists

1-05-3436

where a third party testifies to statements made to him by another nontestifying party that identify the accused as the perpetrator of a crime. *Sullivan*, 366 Ill. App. 3d at 779. We review the evidentiary hearings of a trial court deferentially and reverse only if the trial court abuse its discretion, resulting in manifest prejudice to the accused. *People v. Tolliver*, 347 Ill. App. 3d 203, 222 (2004).

### 1. *Dorothy's Phone Call*

The first instances of purported improper hearsay that defendant complains of include the State's comments during its opening and Van Witzenburg's testimony regarding a phone call from a woman named Dorothy. During its opening statement, the State commented that "another call was received by an elderly lady who was living there on the south side. The elderly lady being--." The trial court had a sidebar and sustained defendant's hearsay objection. The State continued, "[A] few weeks after the first photos were shown to Jeremy and Clifford, a phone call was received by Chicago Police by an elderly lady, a resident in that south side community. After that phone call, police had an opportunity to meet with Jeremy and Clifford again."

During the trial, Van Witzenberg testified that she received a phone call from a woman who would only identify herself as Dorothy:

"Q. After speaking with Dorothy who were you looking for in connection with the shooting that happened on October 3rd of 2003?

A. For an individual with the nickname of 'Scooter' also known as Quention [*sic*] Cox.

* * *

-15-

Q. After receiving the phone call from Dorothy prior to October 20th of 2003 did you request that anything be generated with regards to this case?

A. Yes.

Q. What did you request be generated?

A. An investigative alert.

* * *

Q. Was anything else generated?

A. A photo array."

On cross-examination, Van Witzenberg admitted that Dorothy was not an eyewitness to the shooting and was never asked to view a lineup. Van Witzenberg continued, "Dorothy remained anonymous. She said she was a senior citizen who refused to give her address or return phone calls."

Defendant argues that informing the jury that the police learned information from a caller that led police to create another photo array indicated to the jury "that the caller identified Quentin" as the shooter. The State responds that the testimony was properly elicited to explain the circumstances of defendant's identification and arrest.

Defendant waived the alleged error by failing to object to the testimony at trial. *People v. Pinkney*, 322 Ill. App. 3d 707, 715 (2000). Waiver notwithstanding, however, we find that the testimony was properly admitted.

Where testimony of an out-of-court statement is offered, not for the truth of the matter asserted, but for the limited purpose of explaining the reason the police conducted their

investigation as they did, the testimony is not objectionable on the grounds of hearsay. *People v. Rodriguez*, 312 Ill. App. 3d 920, 929 (2000). As one court recognized, " 'In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct.' " *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989), quoting E. McCormick, *Evidence* §249, at 734 (3d ed. 1984). Likewise, an officer may testify that a conversation with an individual took place and that he or she acted thereon because such testimony is within the officer's knowledge and is not hearsay. *People v. Gacho*, 122 Ill. 2d 221, 248 (1988).

For example, in *Gacho*, an officer, in detailing the police investigation that led to the defendant's arrest, testified that he spoke to the victim of the shooting at the hospital and then went to look for the defendant. Our supreme court rejected the defendant's argument that the victim's hearsay testimony was indirectly injected into the proceeding. If the substance of the conversation had been testified to, it would have been objectionable as hearsay; however, the officer's testimony was not of the conversation, but to what he did and the investigatory procedure. *Gacho*, 122 Ill. 2d at 248. "Such testimony is not hearsay because it is based on the officers' own personal knowledge, and is admissible although the inference logically to be drawn therefrom is that the information received motivated the officers' subsequent conduct." *Gacho*, 122 Ill. 2d at 248. See also *People v. Jordan*, 282 Ill. App. 3d 301, 305 (1996) (officer's testimony that she had conversations with citizens during the course of her investigation and afterwards went looking for the defendant was admissible because it was based on the officer's own personal knowledge).

Here, Van Witzenburg did not testify about the content of the conversation. Instead, her testimony was only that she spoke to Dorothy and what she did in response to the conversation. As Van Witzenburg did not testify as to the substance of her phone conversation with Dorothy, her testimony was proper, even if, as defendant contends, "the inference logically to be drawn therefrom is that the information received motivated the officer's subsequent conduct." *Jordan*, 282 Ill. App. 3d at 306. Indeed, defendant's own cross-examination clarifies Dorothy's role in the investigation, as Van Witzenberg testified that Dorothy was not an eyewitness and she never viewed a lineup.

Finally, defendant argues that Van Witzenberg offered "gratuitous details" of her conversation with Dorothy, *i.e.*, that Dorothy was elderly, lived on the South Side, and knew defendant's nickname. In *People v. Henderson*, 142 Ill. 2d 258, 304 (1990), *declined to follow on other grounds*, *People v. Terry*, 183 Ill. 2d 298 (1998), our supreme court held that testimony recounting the steps taken in a police investigation does not violate the sixth amendment, "even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime." We find that these facts did not constitute a gratuitous revelation of the substance of Dorothy's statements; Van Witzenberg never testified as to what Dorothy actually said. "The mere fact that one of the many inferences [that] the jurors could have drawn from this testimony ***" was that Dorothy implicated defendant does not render Van Witzenberg's testimony inadmissible. *Henderson*, 142 Ill. 2d at 303-04, quoted in *People v.*

*Ivory*, 333 Ill. App. 3d 505, 515 (2002).

Unlike in *People v. Armstead*, 322 Ill. App. 3d 1 (2001), where an officer testified that a witness told him that the defendant was the shooter, Van Witzenberg did not testify regarding the substance of her conversation with Dorothy. Therefore, her testimony was proper.

### 2. *Lance Flowers's Identification*

The second instance of purported hearsay evidence was Detective Bagdon's testimony, in response to the State's question regarding the lineup procedure, that "Lance Flowers viewed the lineup, he identified subject 4, and he went into what we call the TV room." Because Lance Flowers did not testify regarding his identification of defendant as the shooter, defendant contends that Bagdon's testimony was hearsay that allowed the State to bolster the identifications of its other witnesses without subjecting Lance to cross-examination.

The State correctly notes that although defendant raised this issue in his posttrial motion, he failed to object to the testimony at trial. Accordingly, he waived this argument. *Pinkney*, 322 Ill. App. 3d at 715. He claims, however, that we should address his argument under the plain error exception to the waiver rule. 134 Ill. 2d R. 615(a). Nonpreserved errors may be reviewed on appeal if the evidence is closely balanced or where the errors are of such a magnitude that the defendant was denied a fair and impartial trial. *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000). "Admission of hearsay identification testimony constitutes plain error only when it serves as a substitute for courtroom identification or is used to strengthen and corroborate a weak identification." *People v. Hughes*, 259 Ill. App. 3d 172, 178-79 (1994).

Defendant, relying on *People v. Rivera*, 277 Ill. App. 3d 811 (1996), contends that

Bagdon's testimony substituted for a proper courtroom identification and allowed the State to bolster the identifications of other witnesses without subjecting Lance to cross-examination. In *Rivera*, a police officer testified that he brought the defendant and two other Hispanic males to the scene of the shooting, where he had a conversation with "some citizens." *Rivera*, 277 Ill. App. 3d at 817. The officer testified that the three got out of the police car and the citizens said, "yeh, that's them." *Rivera*, 277 Ill. App. 3d at 817. Although the defendant's objection was sustained, the State continued to delve into the subject and later stressed the event in closing argument. Defense counsel did not object to the followup question or the State's comment in closing.

On appeal, the court held that "the hearsay testimony, reclaimed by the prosecutor's next question and final argument, was error, notwithstanding the trial court's attempt to mitigate the damage." *Rivera*, 277 Ill. App. 3d at 820. The evidence was closely balanced, and the out-of-court identification testimony caused grave harm because it served as a substitute for courtroom identification. *Rivera*, 277 Ill. App. 3d at 823. This error, when considered with the State's improper comments during closing argument, constituted plain error and warranted reversal. *Rivera*, 277 Ill. App. 3d at 823. See also *People v. Virgin*, 302 Ill. App. 3d 438 (1998) (in a closely balanced case, the cumulative effect of hearsay errors was plain error); *People v. Furby*, 228 Ill. App. 3d 1, 9 (1992) (given closely balanced evidence, a hearsay statement from an anonymous source that the defendant "was possibly involved" in theft was plain error); *People v. Johnson*, 202 Ill. App. 3d 417 (1990).

*Rivera* is distinguishable. In *Rivera*, the State's identification witness testified that

-20-

someone "filled in the blank" for him, and he contradicted himself on the color of the defendant's shirt. Neither Jeremy nor Clifford suggested that anyone "filled in the blank" for them, and their descriptions of defendant were consistent. While Dominique and Charles testified that the witnesses told each other whom to choose at the lineup, evidence was presented to refute them. In addition, the *Rivera* witness identified the defendant when he was handcuffed to two other men in the back of a squad car. All four witnesses here identified defendant in a lineup. Finally, the *Rivera* defendant also denied that he was present when the shooting occurred; here, however, defendant did not present an alibi defense.

This case is more similar to *People v. Rice*, 321 Ill. App. 3d 475 (2001). In *Rice*, an officer testified that he and his partner had received information from unidentified bystanders that the defendant was "involved in" the shooting. We held that, in this context, "involved in" clearly implied that the defendant was a gunman or an accomplice. *Rice*, 321 Ill. App. 3d at 481. We also rejected the State's argument that the out-of-court identification was solely an explanation of police procedure and held that we "are at a loss to imagine what could be more central to the determination of the defendant's guilt or innocence than whether he was 'involved in' the shooting." *Rice*, 321 Ill. App. 3d at 484. While admission of the officer's testimony concerning the out-of-court identification was error, the defendant did not call the error to the trial court's attention. *Rice*, 321 Ill. App. 3d at 484. Therefore, "[g]iven the strength of the properly admitted evidence against the defendant, we do not believe the hearsay identification rose to the level of plain error under the circumstances of this case." *Rice*, 321 Ill. App. 3d at 484-85. See also *People v. Davis*, 285 Ill. App. 3d 1039 (1996).

We similarly find that, due to the strength of the properly admitted evidence, Bagdon's testimony did not rise to the level of plain error. Jeremy and Clifford identified defendant in a lineup and in court, and Dominique and Charles testified before the grand jury that they identified defendant in the lineup. Although Jeremy and Clifford each pointed out people who were not the defendant in the first and second photo arrays, respectively, they only pointed out people who looked *similar* to the shooter. They were certain of their identifications of defendant at the lineup, where Jeremy said "that was the guy, unless he had a twin brother." Furthermore, the jury was entitled to consider as substantive evidence Dominique's and Charles's grand jury testimony, where they admitted that they identified defendant at the lineup. While defendant suggests that the lineup procedure was suggestive, testimony by the police, Jeremy, and Clifford refutes that argument.

We also find significant the context in which the statement was made. Bagdon's testimony that Lance Flowers identified "subject four" was made in the context of explaining the lineup procedure, the fairness of which defendant brought into question a number of times. Defense counsel did not object and, unlike the prosecutor in *Rivera*, the State did not emphasize the testimony in further questions or in closing argument. Indeed, this was the only time that Lance Flowers's identification was raised.

According to defendant, the statement was "particularly harmful" in light of *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Defendant's motion for new trial only cited *Rivera*. To the extent that defendant alleges a *Crawford* violation, we note that a confrontation clause violations are subject to the harmless-error analysis. *People v.*

*Patterson*, 217 Ill. 2d 407, 428 (2005). We reiterate that due to the strength of the properly admitted evidence, the admission of the statement was harmless.

We further reject defendant's alternative argument that his trial counsel's failure to object constituted ineffective assistance of counsel. To show ineffective assistance of counsel, defendant must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that defendant was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). There is a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland,* 466 U.S. 668 at 689, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We "may resolve ineffectiveness claims under the two-part *Strickland* test by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance." *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998). For the reasons explained above, we find that defendant has failed to establish prejudice because the other identification evidence was overwhelming.

### C. State's Closing Argument

Defendant argues that he was denied a fair trial because the State made a comment in its closing argument that was not based on the evidence. "[D]efendant faces a substantial burden in attempting to achieve reversal [of his conviction] based upon improper remarks made during closing argument." *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002). Prosecutors enjoy wide latitude in closing arguments, and the scope of permissible arguments rests within the sound discretion of the trial court. *People v. Walker*, 262 Ill. App. 3d 796, 804 (1994). A reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments

unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004).

The State argued in rebuttal that Dominique and Charles had to post bond in order to take the witness stand. Further:

"These witnesses for some reason or another between the time of the shooting until now decided that they didn't care about this case anymore. And you know what that reason just might be? *** Where do these witnesses still live? *** 99th and Charles Street, one block from the shooting. So when these witnesses come into court months later and come up with a reason why, they'll tell you about the shooting. 'I'll tell you about seeing a gun, the movement of how I ran afterward. I'll even describe the path of my running, which corroborates the exact path of the running and all the other details that was [*sic*] supplied by Jeremy and Clifford. But you know what, I'm not going to come to court and identify his actual face in court'--the reason they do not is because as I said in the beginning, the kind of violence that the defendant perpetrated out there impacts the community. It impacts the fear and struck terror in the hearts of young Jeremy and Clifford[,] who will never forget what they saw. *** It impacts the community because people have to continue living in that community where the shooting occurred, have family there."

The trial court overruled defendant's objections to this argument.

Defendant contends that there is no evidence to support the State's argument that

Dominique and Charles refused to testify because they still lived in the neighborhood and were afraid. "To be proper, closing argument comments on evidence must either be proved by direct evidence or be a fair and reasonable inference from the facts and circumstances proven." *People v. Hood*, 229 Ill. App. 3d 202, 218 (1992). Dominique testified that he still lived at 99th and Charles. Charles testified that he "stays" at 99th and Charles, albeit not on a daily basis, and his family still lives there. Therefore, the State's comment as to where Dominique and Charles lived was supported by the evidence. The State's argument that Charles and Dominique did not want to become involved in the case is also supported by the evidence, as warrants were issued for their arrest when they failed to appear in court for this case.

It is improper, however, for the State to suggest that a witness was afraid to testify because the defendant threatened or intimidated him when that argument is not based on evidence produced at trial. *People v. Walker*, 230 Ill. App. 3d 377, 400 (1992). In *People v. Mullen*, 141 Ill. 2d 394 (1990), a witness initially testified but then refused to answer questions. When the witness returned to the stand the next day, the trial court admonished the attorneys not to ask any questions or make any reference to why he was initially reluctant to testify. In closing argument, however, the State argued without objection that witnesses were reluctant to testify because they were afraid that the defendant would shoot them in the back if they did so. Because the evidence was closely balanced and "littered with discrepancies" and the State blatantly disregarded court orders and placed great emphasis on the excluded evidence in its argument, the court found plain error. *Mullen*, 141 Ill. 2d at 407.

In *Rivera*, 277 Ill. App. 3d at 820, the State argued in closing that, by testifying, a witness

"took his life in his own hands" and that lying and framing an innocent Latin King "would be to sign his own death warrant." However, there was no indication in the record that the witness was reluctant or that he feared retaliation. The court found that the State was implying that it had some "secret knowledge about who lives and who dies at the hands of the Latin Kings": a guilty verdict would save his life, and a not-guilty verdict would end it. *Rivera*, 277 Ill. App. 3d at 822. Because the evidence was closely balanced, the cumulation of this and other errors warranted reversal. *Rivera*, 277 Ill. App. 3d at 823.

The State's comment that Charles and Dominique did not care about the case anymore because the crime "impacts the community because people have to continue living in that community where the shooting occurred" was much less specific and inflammatory than those in *Mullen* and *Rivera*; here, the State, at most, *implies* fear on the part of the two witnesses. Furthermore, counsel did not violate a court order, as the *Mullen* prosecutor did, and the record here is not "littered with discrepancies" (*Mullen*, 141 Ill. 2d at 407) or closely balanced (*Rivera*, 277 Ill. App. 3d at 823).

*Walker*, 230 Ill. App. 3d 377, is instructive. In *Walker*, the State argued in closing, "It's people who are watching, and they come in at the risk of their own lives when we can find them, and when they are willing to lay their own lives on the line to come in *** and that's what Harvey Webb did in this case." *Walker*, 230 Ill. App. 3d at 399. The court found that the comment was not prejudicial because it was not highlighted, repeated, or otherwise emphasized. *Walker*, 230 Ill. App. 3d at 400. Furthermore, any prejudicial impact was minimized by the fact that the witness's fright was not specifically attributed to the defendant. *Walker*, 230 Ill. App. 3d at 400.

It distinguished other cases cited by the defendant because "[h]ere, we are not faced with a case where fundamental flaws permeated the trial or cumulative errors prejudiced the jury." *Walker*, 230 Ill. App. 3d at 402. See also *People v. Washington*, 243 Ill. App. 3d 138, 149 (1993).

Similarly, here, the State did not specifically attribute any fear on the part of Charles and Dominique to defendant; rather, it argued that the two and their families still lived in the area where the shooting occurred and that the "kind of violence that the defendant perpetrated out there impacts the community." See *Walker*, 230 Ill. App. 3d at 400. Furthermore, because the excerpted portion is the State's only reference to Dominique's and Charles's alleged fear, the comment was not highlighted, repeated, or otherwise emphasized. *Walker*, 230 Ill. App. 3d at 400.

### D. Sentence

Finally, defendant contends that the court abused its discretion by sentencing him to terms of 40 years' imprisonment for the murder and 25 years for the enhancement. The sentencing range for first-degree murder is 20 to 60 years' imprisonment (730 ILCS 5/5-8-1(a)(1) (West 2004)), and the mandatory additional sentence for the use of the firearm is 25 years to natural life. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004). Defendant argues that the trial court failed to consider the mitigating factors of rehabilitative potential, his age, and his lack of criminal history.

The sentencing decisions of a trial court are entitled to great deference and weight because "a trial judge is in a far better position than an appellate court to fashion an appropriate sentence" based on firsthand consideration of the defendant's credibility, demeanor, moral character, and other relevant factors. *People v. Govea*, 299 Ill. App. 3d 76, 91 (1998), citing *People v.*

1-05-3436

*Perruquet*, 68 Ill. 2d 149, 154 (1977). A sentence is presumptively correct, and a trial court's sentencing decision will not be disturbed, absent an abuse of discretion. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001).

We reject defendant's argument. During the sentencing hearing, the trial court noted defendant's age and found the lack of a criminal record to be a "significant factor in mitigation." In addition, the court considered defendant's good childhood and relationship with his family, as well as his grades in school and the fact of his parents' employment. Furthermore, at the hearing on defendant's motion to reconsider the sentence, the trial court specifically stated that it considered the statutory factors in mitigation and aggravation in determining defendant's sentence.

In determining a sentence, the trial court must balance the interests of society against the ability of a defendant to be rehabilitated. *Tye*, 323 Ill. App. 3d at 890. However, a trial court is not required to give greater weight to the rehabilitative potential of a defendant than to the seriousness of the offense. *Govea*, 299 Ill. App. 3d at 91. In fact, the seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence. *Tye*, 323 Ill. App. 3d at 890. The trial court correctly noted the seriousness of the crime, as defendant shot Davis in the back as he was running away with other teenagers. Davis was on his way to a high school football game, and defendant endangered the lives of several others that night.

Defendant also contends that the trial court erred in "focusing on" his decision to remain silent during sentencing. The trial court made a passing reference to the fact that defendant "doesn't have anything to say." It is apparent, however, that the trial court was merely

responding to defense counsel's expression of sympathy to the victim's family for their loss by stating that it would be better coming from defendant. Furthermore, the trial courted noted that defendant "expresses no remorse or any other feelings for that matter." This comment was also proper, as the trial court was permitted to consider defendant's apparent lack of remorse as part of his demeanor in sentencing. *People v. Hall*, 159 Ill. App. 3d 1021, 1033 (1987). We find that the court was not using defendant's silence against him.

We find that the trial court did not abuse its discretion when it sentenced defendant to 40 years' imprisonment for the murder conviction and a 25-year enhancement for personally discharging a firearm.

### III. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

CAMPBELL, and O'BRIEN, JJ., concur.