2020 IL App (1st) 170216-U

No. 1-17-0216

Order filed February 13, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12787 |
| | ) | |
| DEMARCUS PORTER, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for attempt first degree murder are affirmed over his contentions that the evidence was insufficient and he was denied the effective assistance of trial counsel.

¶ 2    Following a bench trial, defendant Demarcus Porter was found guilty of six counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)), one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)), and one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2014)). The trial court merged the

findings and sentenced defendant to three concurrent 31-year prison terms for attempt first degree murder. On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt when the victim did not identify him in court and the victim's prior inconsistent statements were not reliable. Defendant further contends that he was denied the effective assistance of counsel by trial counsel's failure to object to the admission of a recording of a phone call that lacked an adequate foundation. We affirm.[1]

¶ 3    We set forth the proceedings and evidence relevant for understanding the issues on appeal.

¶ 4    Brian Bedford testified that at the time of trial he was in prison due to a conviction for aggravated unlawful use of a weapon. On the morning of June 22, 2014, as he crossed the intersection of 69th Street and Talman Avenue in Chicago, a person came around a tree and shot him. The shooter was around two feet from Bedford, but he could not see the shooter's face. He then clarified that although the shooter's face was partially covered by a t-shirt, he saw a portion of the face between the eyes and facial tattoos of the numbers seven and two. He knew a "few people" who had that tattoo. Bedford heard "maybe three" gunshots. The shooter fled, then turned around to "finish shooting." At this point, Bedford saw his face again. Two other men with firearms were also present. He did not see any of the three men in court. After the shooter and his companions left, Bedford's girlfriend Hope Wright appeared and transported him to the hospital. Bedford was shot 12 times in the chest, ribs, arms, buttocks, and groin.

¶ 5    The day after the shooting, detectives visited Bedford at the hospital. He told them that "Hustle" Porter, someone he grew up with and had known for 20 years, shot him. Bedford also

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

wrote this information in a note that he identified in court. It stated, "I got love for him still," "Hustle Porter," and "Try your best to get him before I do." Bedford then identified defendant in court as Hustle. On June 26, 2014, a detective visited Bedford at the hospital and showed him a photographic array. At trial, Bedford identified the photo advisory form that he signed as well as the photo array itself. Defendant was the subject of the photo identified in the array. At trial, Bedford identified his signature on the picture of defendant, the handwritten phrase "He shot me," and the handwritten date of June 26, 2014.

¶ 6    On July 2, 2014, while still at the hospital, Bedford made a written statement to a detective and two assistant state's attorneys (ASAs). At trial, Bedford identified the statement, which bore his signature on each page, and the accompanying photograph of defendant which Bedford signed and labeled "Hustle Demarcus Porter." In the photograph, defendant has a "72" facial tattoo. At trial, Bedford admitted that he said in the statement to the ASAs that he recognized Hustle because of the facial tattoos, that Hustle and the other men pointed firearms at him, and that Hustle discharged a firearm at him. He also acknowledged saying that while he was on the ground, Hustle shot him several more times and that Hustle was the subject of the photograph.

¶ 7    During cross-examination, Bedford admitted that he was previously in jail for possession of cannabis and crack, but denied being jailed for "robberies" or using crack. In addition to Hustle, "Suave" was also present when Bedford was shot.

¶ 8    Wright testified that she had a previous conviction for possession of a controlled substance and was in a relationship with Bedford in June 2014. When she arrived at 69th and

Talman to pick Bedford up, he was on the ground and conscious but not able to talk. Wright and another woman helped Bedford into her vehicle and she transported him to a hospital.

¶ 9     Chicago police detective Mark Baxtrom testified that he met with Bedford at a hospital on June 23, 2014. Bedford was in pain and had difficulty talking, but was coherent. When Baxtrom asked Bedford who shot him, Bedford wrote, in pertinent part, " 'Hustle Porter, street name. Try your best to get him before I do.' "

¶ 10    Chicago police detective Roland Rios testified that on June 26, 2014, he showed Bedford a photographic array which included defendant's photograph and asked Bedford who shot him. Bedford picked the photo of defendant and said "that is Hustle." After learning that defendant was arrested on July 2, 2014, Rios and two ASAs visited Bedford at a hospital and Bedford signed a written statement. Bedford also identified a photograph of defendant as Hustle, the person who shot him.

¶ 11    Dr. Jane Lee testified that she treated Bedford in the emergency room. He had been shot multiple times and had 12 gunshot wounds, including injuries to both arms, chest, right thigh, back, and buttocks.

¶ 12    The State offered into evidence the photographic array advisory form, the photographic array, Bedford's handwritten note, and the written statement that Bedford signed. The defense did not object, and the trial court admitted the items into evidence.

¶ 13    Defendant testified that he had previously been charged with attempt murder and found not guilty. He did not know where he was on the afternoon of June 22, 2014. Defendant knew Bedford, but never spoke to him, had contact with him, or shot him. Defendant identified "Suave" as Dexter McCray and denied that McCray had any facial tattoos. During cross-

examination, defendant acknowledged that he went by "Hustle" and that Bedford was known as "B." Defendant made phone calls while he was in jail, but denied making a phone call on July 5, 2014, during which he tried to arrange to offer Bedford $10,000 not to testify. Defendant acknowledged having "72" tattooed on his face on the date of the shooting. During redirect, defendant denied phoning Bedford, knowing his phone number, or ever speaking to him. He would not have offered Bedford money because he did not have any. During recross, defendant denied wanting "Keisha" to contact Bedford.[2]

¶ 14     Prior to the State's case in rebuttal, the defense objected because the State intended to play one phone call out of "hundreds of hours" of recordings in which defendant denied his involvement in the offense. The defense stated that if the court were to admit the call, it should also listen to every call where defendant denied involvement. The court replied that it would listen to all of the calls. However, after further discussion, the parties agreed that the court should only listen to the portion of the July 5 phone call that the State would publish.

¶ 15     The State called Kimberly Hofsteadter, an investigator with the Inspector General's Office at the Cook County Department of Corrections. Hofsteadter testified that the jail provided phones for the inmates' use and that every phone call is recorded by Securus, an outside agency contracted by the sheriff's department. Securus's system allows outgoing phone calls to be recorded and monitored. Inmates are not permitted incoming calls. In order to make a phone call, an inmate must pick up the phone, say his name, enter his PIN number, and wait for the person on the other end of the line to respond. Each inmate receives a unique PIN during the booking process. Defendant's PIN was 2014 0704104. Hofsteadter identified defendant's booking photo

---

[2] Keisha's surname is not included in the record.

and PIN, a computer-generated record kept in the ordinary course of business at the jail. The jail also records and monitors the phone calls in its ordinary course of business.

¶ 16    In preparation for her testimony, Hofsteadter compiled the recordings of eight calls made by defendant under his PIN number, including one made on July 5, 2014, at approximately 9:30 a.m. The State sought to admit a portion of the July 5 phone call. The defense objected, and the trial court overruled the defense's objection. Hofsteadter then testified that at the time of booking, all inmates are advised that their phone calls are recorded and that each time an inmate makes a phone call, the fact that the call will be recorded is announced in the call. When an inmate makes a call, he must say his name into the telephone.

¶ 17    The recording was then played.[3] The trial court later paraphrased what it heard on the recording, as "[f]ive before and five after," and that "he really needs a car." Neither party objected to the trial court's summary.

¶ 18    During cross-examination, Hofsteadter admitted that when she listened to the phone calls, she did not hear defendant admit to shooting anyone. She did not know who else was on the phone.

¶ 19    The State entered a certified copy of defendant's conviction for possession of a controlled substance in case number 09 CR 1427501 for purposes of evaluating defendant's credibility.

¶ 20    The trial court found defendant guilty of all counts. Defendant filed a motion for a new trial alleging, in pertinent part, that Bedford failed to identify him at trial and the trial court gave "too much weight to the recordings of a desperate man incarcerated for something that he did not

_____

[3] Although a CD of the recording is included in the record on appeal, the files on the CD could not be opened and therefore this court could not listen to the recording. The substance of the recording is not required for the disposition of the issues on appeal.

do." The court denied the motion. The court then merged the aggravated battery count, the aggravated discharge of a firearm count, and three of the attempt first degree murder counts into the remaining three attempt first degree murder counts, and sentenced defendant to three concurrent 31-year prison terms for attempt first degree murder.

¶ 21 This court granted defendant's motion for leave to file a late notice of appeal on February 10, 2017.

¶ 22 On appeal, defendant first contends that he was not proven guilty beyond a reasonable doubt because Bedford failed to identify him in court and Bedford's prior inconsistent statements were insufficiently corroborated.

¶ 23 When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. It is the responsibility of the trier of fact to determine witness credibility, resolve conflicts in the testimony, and weigh the evidence. See *People v. Gray*, 2017 IL 120958, ¶ 35. Accordingly, a reviewing court must not retry the defendant and must draw all reasonable inferences in favor of the State. *People v. Harris*, 2018 IL 121932, ¶ 26.

¶ 24 When a case depends on eyewitness testimony, a reviewing court must determine whether a trier of fact could reasonably accept the testimony as true beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36. The positive testimony of a single credible witness suffices to sustain a conviction, and a defendant's conviction will not be reversed merely because there is conflicting evidence or the defendant asserts that the witness was not credible. *Id.* Instead, a

conviction will be set aside only where the evidence appears "so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *Harris*, 2018 IL 121932, ¶ 26.

¶ 25    To prove defendant guilty of attempt first degree murder as charged in this case, the State had to establish, in pertinent part, that defendant, without lawful justification, with intent to kill, shot Bedford while armed with a firearm which constituted a substantial step toward the commission of first degree murder. 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). To prove defendant guilty of aggravated battery, the State was required to establish that in committing a battery, defendant knowingly discharged a firearm and injured Bedford by shooting him about the body. 720 ILCS 5/12-3.05(e)(1) (West 2014). To prove defendant guilty of aggravated discharge of a firearm, the State was required to prove beyond a reasonable doubt that defendant knowingly discharged a firearm in the direction of Bedford. See 720 ILCS 5/24-1.2(a)(2) (West 2014). Defendant contests only his identification as the shooter.

¶ 26    Here, taking the evidence in the light most favorable to the State, there was sufficient evidence from which a rational trier of fact could find that defendant shot Bedford. Although Bedford testified that he did not see in court any of the three men who approached him with firearms on June 22, 2014 in court, he also testified that he saw the shooter's "72" facial tattoo and the shooter's face when the shooter turned and shot him again. Bedford acknowledged that he met with detectives the day after the shooting and in a handwritten note identified Hustle Porter as the shooter. In court, he identified the note and also identified defendant as Hustle. Bedford further admitted that he identified defendant in a photographic array while hospitalized, and acknowledged writing "He shot me" on the photograph of defendant. Additionally, Bedford acknowledged signing a written statement identifying defendant as the shooter and stating that he

recognized defendant because of defendant's facial tattoos. Bedford identified both the statement bearing his signature and the accompanying photograph of defendant showing defendant's facial tattoos, which he signed and labeled Hustle Demarcus Porter.

¶ 27    Moreover, Baxtrom testified that when he asked Bedford who shot him, Bedford wrote "Hustle Porter." Rios testified that Bedford identified defendant in a photographic array as Hustle, made a written statement, and identified the accompanying photograph of defendant as that of Hustle, the person who shot him.

¶ 28    We are unpersuaded by defendant's argument that Bedford's prior inconsistent statements were insufficient to sustain the trial court's guilty findings. Although defendant acknowledges that a witness's prior inconsistent statements admitted under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)) may be sufficient to support a conviction, he concludes that Bedford's statements were insufficient because they were "not corroborated in any meaningful way" and no physical evidence linked defendant to the shooting.

¶ 29    To the extent defendant argues that section 115-10.1 statements are necessarily suspect or must be viewed with additional scrutiny, we disagree. Pursuant to section 115-10.1 of the Code, a witness's prior inconsistent statements may be admitted as substantive evidence. 725 ILCS 5/115-10.1 (West 2014). In *People v. Curtis*, 296 Ill. App. 3d 991 (1998), this court held that a statement properly admitted under section 115-10.1 may, alone, be sufficient evidence to sustain a defendant's conviction. *Curtis*, 296 Ill. App. 3d at 996-97. The court explained there were "no 'suspect categories' of properly admitted evidence." *Id*. at 999. Instead, one standard of appellate review applies to all evidence, including substantive evidence of prior inconsistent statements.

*Id.* Further, "[o]nce a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may *not* engage in any such analysis." (Emphasis in original.) *Id.*

¶ 30 We are unpersuaded by defendant's reliance on *People v. Parker*, 234 Ill. App. 3d 273 (1992). In that case, the defendant was convicted of murder, armed violence, attempt murder, and aggravated battery, and the only evidence against him were the prior inconsistent statements of three State witnesses that were all disavowed at trial.

¶ 31 The first witness testified he signed a prior statement on the seventh day of a 2½ month hospital stay while he was recovering from surgery and in a great deal of pain, and did so only " 'to get [the detective] out of the hospital room with all those questions.' " *Id.* at 276. The second witness, who was a juvenile when he signed his statement, testified that several officers came to his house with a prepared statement and threatened to arrest him if he did not sign it. *Id.* at 277. The third witness testified not only that the statement he gave to the police was false, but that he was beaten and forced to make the statement by the police. *Id.* at 278. On appeal, the court stated that "where the only evidence that inculpated defendant was prior inconsistent statements which were directly contradicted by the alleged declarants at trial, the credibility of this evidence was greatly reduced." *Id.* at 280.

¶ 32 Contrary to defendant's conclusion, *Parker* does not stand for the proposition that a prior inconsistent statement can never be sufficient evidence to support a conviction. Rather, the court in *Parker* reversed the defendant's convictions on the basis that the prior inconsistent statements of the three witnesses who recanted the content of those statements were the only evidence

against the defendant, and the statements were so seriously impeached at trial as to cast doubt on their authenticity. *Id.* at 280-81. Here, although Bedford did not identify defendant in court, he did not state that the prior identifications were false or made under pressure or threat of violence. Thus, we cannot agree with defendant's conclusion that Bradford's inconsistent statements are unworthy of belief because he was the only eyewitness. See *People v. Arcos*, 282 Ill. App. 3d 870, 875 (1996) (rejecting the theory that "a [section] 115-10.1 statement standing alone is insufficient to convict when later disavowed at trial" because "it is for the trier of fact to weigh the statement, weigh the disavowal, and determine which is to be believed").

¶ 33 In the case at bar, a rational trier of fact could have concluded that Bedford was truthful when he identified defendant as the shooter on three separate occasions immediately after the shooting while in a hospital, and not credible at trial when he did not identify defendant. The mere fact that Bedford's trial testimony did not conform to his prior statements did not render him, or his earlier statements, unworthy of belief. The trier of fact was in the best position to weigh Bedford's credibility, and the trial court's guilty findings indicate that it found Bedford's prior inconsistent statements more reliable than his in-court testimony. Moreover, Bedford's in-court testimony that the shooter had the numbers seven and two tattooed on his face comported with his out-of-court identification of defendant in a photograph wherein defendant had a facial tattoo of the same numbers, and defendant, in his testimony, confirmed that he had such a tattoo on the date of the shooting. Ultimately, when viewed in a light most favorable to the State, the evidence was sufficient for a rational trier of fact to find defendant was the shooter, and, therefore establish his guilt beyond a reasonable doubt.

¶ 34    Defendant next contends that he was denied the effective assistance of counsel when trial counsel failed to object to the admission of the recording of the July 5, 2014 telephone conversation on the basis that the State failed to lay an adequate foundation, as no one familiar with defendant's voice testified he was the person on the recording. Defendant concludes that he was prejudiced because the trial court relied on the recording to reject defendant's testimony and find him guilty.

¶ 35    To succeed on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that he was prejudiced by that deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687-88, (1984).

¶ 36    The admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs only when the trial court's ruling is arbitrary or fanciful or where no reasonable person would adopt the court's view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 37    Relevant and material audio recordings are admissible when "a proper foundation has been laid to assure the authenticity and reliability of the recording." *People v. Aliwoli*, 238 Ill. App. 3d 602, 623 (1992). A sufficient foundation exists when "a participant to the conversation or a person who heard the conversation while it was taking place identifies the voices of the people in the conversation and testifies that the tape accurately portrays the conversation." *In re C.H.*, 398 Ill. App. 3d 603, 607 (2010). In cases where there is no witness with personal knowledge of what the recording portrays, however, a sufficient foundation may be laid under the silent witness theory.

¶ 38    Under the silent witness theory, a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording. *People v. Vaden*, 336 Ill. App. 3d 893, 898 (2003). Generally, this is shown when the recording's proponent presents "evidence as to (1) capability of the device for recording; (2) competency of the operator; (3) proper operation of the device; (4) preservation of the recording with no changes, additions, or deletions; and (5) identification of the speakers." *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001).

¶ 39    In *People v. Sangster*, 2014 IL App (1st) 113457, we addressed the silent witness theory's applicability to a recording system incorporated into the general functions of a correctional facility. In *Sangster*, the defendant argued, as does defendant in this case, that the State failed to lay a proper foundation for the admission of a recorded jail phone call. *Id*. ¶¶ 46, 49. We disagreed, finding that a proper foundation had been laid when a correctional officer who had listened to and downloaded the audio recording testified that the jail telephone system required a personal identification number and voice recognition identification before a call could be initiated. *Id*. ¶¶ 50-52. Thus, the ability of the defendant to make the phone call and the jail telephone system's recording of the call provided sufficient proof the jail telephone system was working properly. *Id*. ¶ 50. We also noted that the correctional officer testified to her competency in operating the phone system by stating she was trained by the actual supplier of the phone system, and found that the fact a call was placed and recorded using the jail telephone system showed proper operation of the recording device. *Id*.

¶ 40    With respect to the fourth element of the silent witness theory, we noted that the defendant had made no colorable claim at trial or on appeal that the recording was not authentic or accurate. *Id*. ¶ 51. Thus, the State needed only to establish a probability that the recording was accurate, and "[a]ny deficiencies would go to the weight, rather than the admissibility, of the evidence." *Id.* Finally, we found that the caller's voice which triggered the call, his discussion of the facts specific to the case, and his attempt to contact other witnesses, were sufficient evidence of identification of the defendant as the caller. *Id*. ¶ 52.

¶ 41    We find that Hofsteadter's testimony and other relevant parts of the record meet the standard set in *Sangster* for authenticating an audio recording from a recording system incorporated into the general functions of a correctional facility under the silent witness theory.

¶ 42    Here, Hofsteadter testified that the jail provided phones for inmate use, that every call is recorded by an outside agency, and that the system permits outgoing calls to be recorded and monitored. In order to make an outgoing call, an inmate must say his name, input his PIN, and wait for the person on the other end of the line to respond. Hofsteadter further testified that each inmate receives a unique PIN during the booking process, that during the booking process each inmate is informed that his outgoing calls will be recorded, and that an announcement that the phone call will be recorded is made during each outgoing call. Hofsteadter identified defendant's booking photo and PIN, and testified that she had compiled recordings of eight phone calls made by defendant under his PIN, including one made July 5, 2014. While it is true that Hofsteadter did not testify specifically that the recoding system was operating correctly at the time of the call, the fact the audio recording exists at all demonstrates the system functioned. *People v. Taylor*, 2011 IL 110067, ¶ 39 ("While the camera may not have worked perfectly it clearly

worked. As one court has stated, ' [t]he fact that the tape[ ] exist[s] at all is evidence that the tape recorder was functional and that [the operator] knew how to operate it.' " (quoting *Willett v. Russell M. Stookey, P.C.*, 256 Ga. App. 403, 568 S.E.2d 520, 526 (2002))).

¶ 43    To the extent defendant contends that the recording was improperly admitted because no one familiar with his voice testified that it was his voice on the recording, and the fact that the call was made with his PIN is "meaningless," he has failed to identify any evidence demonstrating the call was anything but authentic. As we stated in *Sangster*, when "a defendant does not present any actual evidence of tampering, substitution, or contamination, the State need only establish a probability that those things did not occur." *Sangster*, 2014 IL App (1st) 113457, ¶ 51. The same reasoning applies here. Moreover, the record reveals that at certain points during trial, contrary to defendant's position on appeal, the defense actually argued that the trial court should listen to all the calls attributed to defendant's PIN to establish that defendant repeatedly denied committing the crime.

¶ 44    Based on Hofsteadter's testimony and the lack of any evidence to the contrary, the State adequately established the jail's phone call recording system worked properly and no tampering occurred. See *id.* ¶ 48 ("a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording"). Accordingly, the trial court's admission of the recording of the July 5 phone call was not an abuse of discretion. As the phone call was properly admitted, defendant cannot establish that he was prejudiced by trial counsel's failure to object and as a result his claim of ineffective assistance must fail. *People v. Holmes*, 397 Ill.

App. 3d 737, 745 (2010) ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection.").

¶ 45    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed.