2024 IL App (1st) 231330-U

No. 1-23-1330

Order filed December 31, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12787 |
| | ) | |
| DEMARCUS PORTER, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the trial court summarily dismissing defendant's first-stage petition for postconviction relief is reversed, and the matter is remanded for second-stage proceedings.

¶ 2    Following a bench trial, the trial court found defendant Demarcus Porter guilty of the attempt first degree murder of Brian Bedford and sentenced him to a 31-year prison term. No forensic evidence tied defendant to the crime, no other eyewitnesses testified, and defendant never made a statement admitting to the shooting. The State's case relied on the identification testimony

of Bedford, even though his assailant's face was covered by a t-shirt and he could only see a horizontal strip of his assailant's face, including the eyes and the numerical tattoos "seven" and "two." Bedford acknowledged that he knew multiple people with that tattoo.

¶ 3 Following his direct appeal in which we affirmed, defendant filed a petition for postconviction relief pursuant to the Postconviction Hearing Act (the Act), 725 ILCS 5/122-1 *et seq.* (West 2022). That petition claimed that trial counsel provided ineffective assistance by failing to call an eyewitness testimony expert and failing to move to suppress Bedford's identification. The trial court summarily dismissed that petition at the first stage.

¶ 4 For the reasons that follow, we reverse the judgment of the trial court and remand for second-stage proceedings.[1]

¶ 5                                    I. BACKGROUND

¶ 6 Following a bench trial, defendant was found guilty of six counts of attempt first degree murder (720 ILCS 5/8-4 (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)); one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)); and one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2014)). On direct appeal, defendant contended that the evidence was insufficient to establish his guilt and that trial counsel provided ineffective assistance by not challenging the admission of recordings of telephone calls that defendant made while in custody. We affirmed, and we recite the facts from trial relevant to defendant's instant petition.

¶ 7 Brian Bedford, who was incarcerated at the time of trial for a conviction for aggravated unlawful use of a weapon, testified that someone shot him on the morning of June 22, 2014, as he

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

crossed the intersection of 69th Street and Talman Avenue in Chicago, Illinois. The shooter, along with two other men with guns, emerged from behind a tree. No testimony established that any words were spoken between any of the individuals. Likewise, no testimony established that the shooters made any demands of Bedford. One of the armed men simply opened fire from two feet away. Immediately after being asked whether all three men had guns, the State asked Bedford, "Do you see someone in court today that you recognize as one of those three individuals?" and Bedford responded, "No."

¶ 8    Bedford testified that he could not see the shooter's face because it was partially concealed by a t-shirt. He could only see a portion of the shooter's face including the eyes and facial tattoos for which he said, "I thought it was numbers." He went on to describe the tattoo as being the numbers "seven" and "two." When asked if he had seen that tattoo before, he replied, "Not really but I have seen it." The State asked if Bedford knew anyone in particular with that tattoo and he responded, "Yeah, I know a few people."

¶ 9    Bedford was shot repeatedly in the chest, arms, buttocks, and groin. He claimed the assailant shot him three times, began to flee, then stopped, and started shooting again. Bedford's girlfriend arrived at the scene and took him to the hospital where he underwent surgery to repair his lung and remove his spleen.

¶ 10    Detectives visited Bedford while he was recovering in the hospital, and Bedford told them he thought the shooter was someone named Hustle Porter, who Bedford knew from the neighborhood. At that point, the State asked Bedford if he saw that individual in court, and Bedford identified defendant. Bedford also identified a piece of paper he gave detectives on which he had written "Street name Hustle Porter," and "I got love for him still."

¶ 11    Bedford was shown a photo array in the hospital and he identified a photo of defendant. He also selected two photos which contained other individuals that he recognized, but he did not recognize them from the shooting. Bedford subsequently had a conversation with an unnamed assistant State's attorney during which Bedford claimed he recognized defendant as the shooter because of the tattoos on his face. Under cross-examination, Bedford stated that he recognized one of the other men with guns as someone he knew as "Suave." Bedford could only describe the guns carried by his assailants as "automatics."

¶ 12    Defendant testified in his own defense and admitted that he had previously been acquitted of attempt murder. He could not remember where he was on the afternoon of June 22, 2014, and, although he knew Bedford, he never spoke to him, had no contact with him, and never shot him. Defendant identified "Suave" as someone named Dexter McCray, but denied that McCray had any facial tattoos. Defendant further admitted he went by the name "Hustle." During cross-examination, defendant denied making a phone call from jail to an unspecified person to arrange to offer Bedford $10,000 not to testify. On redirect examination, defendant insisted he could not have made such an offer because neither he nor his family had that amount of money.

¶ 13    A number of recordings of phone calls defendant placed from the Cook County Department of Corrections were admitted into evidence. As we noted in our order for defendant's direct appeal, those audio files were included in the record on appeal, but could not be opened. *Porter*, 2020 IL App (1st) 170216-U, ¶ 17, n. 3. The record on appeal in the instant case does not contain these recordings, either. But the trial court summarized one of the phone calls as being a call between, "[defendant] and his sister in regards to a payment, five thousand dollars up front. He doesn't even

have a car. They will give him five now and five later." The record provides no further summary of the phone call or its context.

¶ 14    Kimberly Hofsteadter, an investigator employed by the Inspector General's Office at the Cook County Department of Corrections testified that she was responsible for investigating defendant's jail phone calls. When she listened to the recordings of defendant's jail phone calls, she never heard him admit to shooting Bedford.

¶ 15    On April 10, 2023, following his direct appeal, defendant, represented by postconviction counsel, filed a petition for postconviction relief. That petition alleged that trial counsel provided ineffective assistance by failing to move to suppress Bedford's identification of defendant or introduce expert testimony regarding the unreliability and fallibility of Bedford's eyewitness identification. Defendant's petition summarized the multiple areas for which expert testimony would have been relevant, including Bedford's opportunity to view the shooter, the high-stress nature of the incident, the presence of a weapon, Bedford's degree of attention, and the accuracy of Bedford's description of the shooter. Defendant cited to multiple cases which have discussed these topics. See *e.g. People v. Allen*, 376 Ill. App. 3d 511, 524 (2007) ("[S]tudies have shown a witness's focus on a weapon indicates less attention is paid to encoding the perpetrator's characteristics."). The petition also attached the text of two studies discussing the effects of high levels of stress on the accuracy of eyewitness memory.

¶ 16    One of the two was a 2004 study of active-duty United States military personnel who were subjected to high-stress and low-stress interrogations. See Charles A. Morgan III *et al.*, *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J. L & Psychiatry 265 (2004). During the high-stress interrogations, the subject was

questioned for 40 minutes by an interrogator while another individual portraying a guard would become physically confrontational if the subject did not appear to be complying with the interrogator's requests. *Id*. at 267-68. The low-stress interrogations involved no physical confrontation, but the subject was presented with the challenge of being "tricked" by the interrogator into giving away information. *Id*. at 268. The interrogators and guards were well lit and did not have their faces concealed. *Id*. Twenty-four hours later, the subjects were asked to select those who interrogated them out of physical line-ups and photo arrays. *Id*. at 269. For the high-stress interrogations, the subjects correctly identified their interrogators in the line-ups and photo arrays 30% and 34% of the time, respectively. In the low-stress interrogations, these numbers increased to 62% and 76%, respectively. *Id*. at 272. The study noted, "Contrary to the popular conception that most people would never forget the face of a clearly seen individual who had physically confronted them and threatened them for more than 30 min[utes], a large number of subjects in this study were unable to correctly identify their perpetrator. These data provide robust evidence that eyewitness memory for persons encountered during events that are personally relevant, highly stressful, and realistic in nature may be subject to substantial error." *Id*. at 275.

¶ 17　The trial court dismissed defendant's petition as frivolous and patently without merit. Regarding the issue of trial counsel's failure to present an eyewitness testimony expert, the trial court's order reasoned that, "Trial counsel's failure to present an eyewitness expert witness is evident from the trial record. Petitioner therefore could have raised the claim on direct appeal, and his failure to do so results in its forfeiture." The trial court also held that, even if defendant's claim was not forfeited, defendant's argument about the testimony an eyewitness expert would provide

was cumulative to what was presented at trial. The trial court reasoned, referring to defendant's attached exhibits:

"Those publications are then connected to the facts of this case and the purported testimony that would have come from an eyewitness expert is detailed in the petition's argument. At that point, this evidence is basically the same as was presented at trial and in the motion for new trial, through counsel's argument about the reliability of the identification as well as the cross-examination of Bedford."

¶ 18 As for defendant's claim that trial counsel was ineffective for failing to attempt to suppress Bedford's identification, the trial court ruled that defendant's petition provided no arguable basis for suppressing the identification such as the suggestiveness of the procedure or police misconduct. This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20 The Act provides a mechanism by which a defendant may raise a collateral attack against his or her conviction based on a claim of actual innocence or where there was a substantial denial of his or her rights under the Constitution of the United States, the State of Illinois, or both. 725 ILCS 5/122-1 *et seq.* (West 2022). The purpose of postconviction proceedings is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12. Review of the trial court's dismissal of a postconviction petition is *de novo*, meaning we afford no deference to the trial court's decision. *Id.*; *People v. Randall*, 2016 IL App (1st) 143371, ¶ 44.

¶ 21 The Act sets out a three-stage process for the adjudication of post-conviction petitions. *Id.* at ¶ 45. At the first stage, the stage pertinent to this case, the trial court is only required to determine

whether a petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2); *Buffer*, 2019 IL 122327, at ¶ 45. A petition is frivolous or patently without merit when it has no arguable basis in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id*. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. *Id*. Fanciful factual allegations include those which are fantastic or delusional. *Id*. at 17.

¶ 22    A first-stage petition does not have to demonstrate or prove a constitutional violation. *People v. Tate*, 2012 IL 112214, ¶ 19. Nor is a defendant required to allege facts supporting all elements of a constitutional claim. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48. The threshold for survival is low, and a defendant need only allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act. *Id*. However, the petition must clearly set forth the respects in which the defendant's constitutional rights were violated. *Id*. Petitions must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed. *Id*. But liberal construction does not mean that we distort reality. *Id*. Whether a defendant is *pro se* at the first stage or he is represented by counsel, this standard remains the same. *Tate*, 2012 IL 112214, ¶ 12.

¶ 23    The United States and Illinois Constitutions guarantee every criminal defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To sustain a claim of ineffective assistance, one must show both that defense counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional norms, and that but for counsel's deficient performance, there was a

reasonable probability that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 694. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id*. at 686.

¶ 24    Judicial scrutiny of counsel's performance must usually be highly deferential. *Id*. We should ordinarily indulge the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional conduct, and defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Id*. at 689.

¶ 25    However, in the context of first-stage postconviction proceedings, determining whether counsel made strategic decisions is inappropriate. *Tate*, 2012 IL 112214, ¶ 22. This is because, at the first stage, a defendant need not "prove" or "demonstrate" ineffective assistance of counsel by showing that counsel's performance was deficient and that it prejudiced his defense. *Id*. ¶ 19. That is a matter for second-stage proceedings. *Id*. Instead, at the first stage, a petition may not be summarily dismissed "if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that defendant was prejudiced." (Emphasis in original.) *Id*.

¶ 26                                A. Forfeiture

¶ 27    We first address the State's argument that defendant has forfeited his claims. Defendant's brief contains no argument regarding his postconviction claim that trial counsel was obligated to move to suppress Bedford's identification. Supreme Court Rule 341(h)(7) requires an appellant's brief to contain argument with citation to authorities and relevant pages of the record, and it states

that points not argued are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Based on the briefing, it appears that defendant has abandoned this argument, and we agree with the State that defendant has forfeited this issue.

¶ 28    However, we disagree with the State's argument that defendant has forfeited the claim that trial counsel was ineffective for failing to call an eyewitness identification expert because it could have been raised on direct appeal. It is, of course, well-established that issues which could have been raised on direct appeal, but were not, are procedurally defaulted. *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007). However, defendant's claim, which relies on scientific studies not present in the record prior to the filing of his postconviction petition, is not one that could have been made on direct appeal. Indeed, the fact that the record was not developed in this way is inextricably intertwined with defendant's claim that trial counsel provided ineffective assistance. As our supreme court has said, "An ineffective assistance claim based on what the record discloses counsel did, in fact, do is subject to the usual procedural default rule." *Tate*, 2012 IL 112214, ¶ 14. "But a claim based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation." *Id*. If defendant raised this argument on direct appeal, his inability to establish prejudice would have been virtually assured because the record was devoid of even potential expert testimony that could have been provided at trial—and that absence is precisely because of the ineffectiveness that defendant now alleges. To invoke forfeiture would penalize defendant for the exact alleged lapse of trial counsel that he now seeks to attack collaterally. Thus, we disagree that defendant forfeited his claim.

¶ 29                                    B. Lack of Affidavits

¶ 30    We also briefly address the State's contention that defendant has not attached an affidavit from a proposed expert witness to his petition. The Act requires that the petition "shall have attached thereto affidavits, records, or other evidence clearly supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2022). But at the first stage, the petition need only allege a limited amount of detail "capable of independent corroboration." *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶ 24 (quoting *People v. Allen*, 2015 IL 113135, ¶ 24). Of note, the petition in *Hayes* attached only scientific studies and cited to other cases on the topic of eyewitness identification. *Id*. ¶ 14. The State's argument that defendant must have attached an affidavit or explain its absence ignores that the Act also allows for "records or other evidence." 725 ILCS 5/122-2 (West 2022).

¶ 31    Moreover, defendant's attached studies here give a clear indication of the type of testimony he would seek to introduce and also indicate that his claim is capable of independent corroboration—the science clearly exists. Additionally, given that the standard at the first stage is the same whether or not one is represented by counsel, it would be patently unworkable to require incarcerated defendants with minimal resources to identify, seek out, communicate with, and obtain a notarized affidavit from an eyewitness identification expert. *Tate*, 2012 IL 112214, ¶ 12. Whether defendant's petition as it exists would survive the second stage, where he must actually demonstrate he is entitled to relief, is another question for another day. But defendant's petition supplies ample information about his claim and the type of testimony he alleges should have been introduced. The threshold for survival at the first stage is low, and defendant need only provide a "limited amount of detail." *People v. Rosado*, 2016 IL App (1st) 140826, ¶ 26. Accordingly,

defendant's failure to identify a specific expert witness and procure an affidavit is not fatal in light of the other factual information attached to his petition.

¶ 32                                    C. Arguable Deficiency

¶ 33    We next address whether defendant's petition satisfies the first prong of our analysis: whether trial counsel's performance was arguably deficient.

¶ 34    Trial counsel performs deficiently when actions or inactions constituted errors so serious as to fall below an objective standard of reasonableness under prevailing professional norms. *Hayes*, 2022 IL App (1st) 190881-B, ¶ 27. The failure to "present available evidence to support a defense" may constitute deficient performance. *Id*. (quoting *People v. York*, 312 Ill. App. 3d 434, 437 (2000)).

¶ 35    *Hayes* is highly instructive here. There, the defendant was convicted of first degree murder based in part on the eyewitness testimony of six different witnesses. *Hayes*, 2022 IL App (1st) 190881-B, ¶ 1. None of the witnesses saw the defendant's face for more than 30 seconds, and some saw it for as little as a few seconds. *Id*. ¶ 7. One eyewitness never saw the defendant's face from the front. *Id*. Descriptions of the defendant's height varied from 5 feet, 6 inches to 6 feet, and there was no consensus about whether the defendant had facial hair. *Id*. ¶ 8. No physical evidence linked the defendant to the crime, and the defendant made no admissions. *Id*. ¶ 35. Following the defendant's conviction and unsuccessful direct appeal, he filed a postconviction petition alleging the ineffectiveness of trial counsel for failing to call an expert in eyewitness identification. *Id*. ¶¶ 13-14. The defendant cited cases referring to "scientific consensus" on weapons focus, along with two scientific studies. *Id*. ¶ 14. The trial court summarily dismissed the petition at the first

stage, relying on deference to trial strategy and that trial counsel "vigorously cross-examined the State's eyewitnesses regarding their identifications." *Id*.

¶ 36    We reversed and remanded for second-stage proceedings, finding that the defendant stated the gist of a constitutional claim. We rejected the argument that trial counsel's decision not to call an expert was trial strategy, because, as we have already noted, that is not an appropriate first-stage consideration. *Id*. ¶ 28. We also noted that, while trial counsel need not introduce or attempt to introduce expert testimony about eyewitness identification in every case involving eyewitnesses, it was arguable that "this is the type of case for which expert eyewitness testimony is both relevant and appropriate." *Id*. ¶ 35 (quoting *People v. Lerma*, 2016 IL 118496, ¶ 26). We reasoned that, "Like *Lerma*, we have no physical evidence linking [the defendant] to the offense, and he made no admissions. Also like *Lerma*, several factors could have contributed to the unreliability of eyewitness testimony including 'the stress of the event itself, the use and presence of a weapon and nighttime viewing.' " *Id*.

¶ 37    This case is squarely in line with *Hayes*. Defendant's case also involved a brief, high-stress scenario with not only the presence of a weapon, but where the only eyewitness was shot multiple times. Additionally, like *Hayes*, there was no forensic evidence linking defendant to the crime and defendant never admitted to the shooting. Furthermore, in *Hayes*, the identification of the defendant was based on six eyewitnesses and there was no evidence that the defendant's face was covered. Whereas here, the identification of defendant was based solely on one witness, the victim who was shot, and only a small portion of defendant's face was visible during the encounter.

¶ 38 One issue we must touch on is the fact that defendant's trial predated *Lerma*, which stated definitively that research regarding eyewitness identification is "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Lerma*, 2016 IL 118496, ¶ 24. Normally, we do not condition effective assistance on trial counsel's ability to predict changes in the law. See *People v. Chatman*, 357 Ill. App. 3d 695, 700 (2005). But as our supreme court observed in *Lerma*, the subject of eyewitness identification expert testimony is not a new one, nor is it one whose propriety has only recently been established. As far back as *People v. Enis*, our supreme court recognized that such testimony may be admissible, even if it should be used with caution. *Lerma*, 2016 IL 118496, ¶ 24; see *People v. Enis*, 139 Ill. 2d 264, 287-89 (1990). Moreover, the studies cited by defendant in his petition were published in 2004, and thus were clearly available to trial counsel.

¶ 39 The State also urges us to conclude that trial counsel's performance was not arguably deficient because trial counsel "vigorously challenged every aspect of the People's case before, during, and after trial." But a thorough analysis of trial counsel's performance is not appropriate at the first stage where the trial court acts "strictly in an administrative capacity by screening out those petitions which are without legal substance or are obviously without merit." *Tate*, 2012 IL 112214, ¶ 12 (quoting *People v. Rivera*, 198 Ill. 2d 364, 373 (2001)). Furthermore, whether trial counsel otherwise performed a thorough defense except for the alleged error is irrelevant if the alleged error was significant enough to alter the outcome of the trial. In fact, that is precisely the analysis we perform at the second stage when we determine whether defendant's claims, if proven, would entitle him to relief. *People v. Sanders*, 2016 IL 118123, ¶ 31 (the question at the second stage is whether the allegations in the petition, taken as true, are sufficient to invoke relief under

the Act). The two cases cited by the State for its argument that trial counsel's performance was not deficient because he vigorously defended the case both concerned direct appeals, and did not involve the low standard that we impose at first-stage postconviction proceedings. See *In re Dante W.,* 383 Ill. App. 3d 401 (2008), and *People v. Bloomingburg*, 346 Ill. App. 3d 308 (2004).

¶ 40    Likewise, the State's argument that the decision not to call an eyewitness expert was trial strategy is one we cannot endorse. "The State's strategy argument is inappropriate for the first stage, where the test is whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether it is arguable that the defendant was prejudiced." *Tate*, 2012 IL 112214, ¶ 22.

¶ 41    The State also argues that *Lerma* does not stand for the proposition that the failure to present an eyewitness expert constitutes ineffective assistance of counsel. That much is true, but this argument only reflects the State's continuing misapprehension of the burden at first-stage proceedings. We agree that not every case involving eyewitness identification warrants an expert. See *Lerma*, 2016 IL 118496, ¶ 25 (finding abuse of discretion in excluding eyewitness expert "given the specific facts presented"). But whether trial counsel actually performed deficiently by not calling an expert here is a question for second-stage proceedings.

¶ 42    Like *Hayes*, it is arguable that "this is the type of case for which expert eyewitness testimony is both relevant and appropriate." Defendant has alleged the ineffectiveness of trial counsel based on the failure to call an eyewitness identification expert, clearly invoking a violation of a constitutional right as required by the Act. As we have observed, there is clear precedent that trial counsel may be ineffective for failing to present evidence that supports a defense, and there is clear precedent for the admissibility of eyewitness expert testimony. Only one eyewitness

identified defendant, and did so during an exceptionally brief encounter where he was shot multiple times. Construing defendant's petition as true, we agree that it was arguably error for trial counsel to not call an eyewitness identification expert. We cannot say that this claim is based upon an indisputably meritless legal theory, nor does it contain factual allegations that are fantastic or delusional. Whether defendant will require more to establish conclusively trial counsel's deficient performance is a question for second-stage proceedings. But he has met the low bar required to survive first-stage proceedings.

¶ 43                                    D. Arguable Prejudice

¶ 44    Next, we must consider if defendant has alleged arguable prejudice from trial counsel's arguably deficient performance. To show prejudice, a defendant must demonstrate a reasonable probability that the result of the trial would have been different had counsel performed adequately. *Hayes*, 2022 IL App (1st) 190881-B, ¶ 39.

¶ 45    The State argues that defendant "cannot plausibly explain how a defense expert would have undermined the reliability of [Bedford]'s identification to the extent that the outcome at trial would have been different." Once again, we note that defendant's burden at this stage is not to demonstrate prejudice but, rather, arguable prejudice. However, the explanation the State seeks is quite plain.

¶ 46    Bedford's only opportunity to view his attacker without any impediment was in the moment before the shooter opened fire—which was an unspecified amount of time. But Bedford's testimony painted the encounter as exceptionally brief. He could only see a thin horizontal strip of the attacker's face, which included eyes and the numerical tattoos "seven" and "two"—tattoos Bedford knew belonged to "a few" people. Bedford provided no additional description of the

shooter. Nor did his testimony offer any insight into how he knew the shooter was not one of the other people he knew with the same tattoo.

¶ 47 The trial court found Bedford's identification credible based on his consistency over the course of the investigation, and the State argues that the trial court already considered the strength of the evidence, including Bedford's identification, and therefore an expert was not needed. But this argument misses the point. It is one thing to argue the credibility of Bedford's identification based on the circumstances. It is another to be able to argue, with scientific force, that even if Bedford was certain who he saw, he still had a strong probability of being incorrect.

¶ 48 The study attached to defendant's petition not only showed that a very low number of participants were able to make correct identifications, but that more than half of the participants positively identified someone other than their interrogators in a line-up or photo array when the true interrogator was present. Morgan, *Accuracy of Eyewitness Memory*, 27 Int'l J. L & Psychiatry at 271-72. Based on defendant's petition, there is an arguable scientific basis to believe that the human brain is rather ill-equipped to make accurate identifications *and* that it more often than not makes incorrect identifications while believing it is correct. In other words, there is some scientific evidence to at least argue that Bedford's confidence and consistency in his identification was not nearly as meaningful as the trial court believed it to be. As *Hayes* noted, "Witness confidence and accuracy may not be related." *Hayes*, 2022 IL App (1st) 190881-B, ¶ 44. By the time witnesses testify, they may be mistaken, all the while "exuding supreme confidence." *Hayes*, 2022 IL App (1st) 190881-B, ¶ 44 (quoting *State v. Henderson*, 208 N.J. 208, 236 (2011)). As a result, "there is almost nothing more convincing to a jury than a live human being who takes the stand, points a

finger at the defendant, and says, 'That's the one!' " *Hayes*, 2022 IL App (1st) 190881-B, ¶ 44 (quoting *State v. Henderson*, 208 N.J. at 237).

¶ 49　Arguable prejudice resulted from the fact that the trial court was not given this sort of scientific evidence to consider alongside Bedford's testimony. An eyewitness identification expert would have added to defendant's defense and it is at least arguable that defendant was prejudiced by the failure to call such a witness.

¶ 50　Accordingly, we hold that defendant's petition established arguable prejudice such that his ineffective assistance of counsel claim merits second-stage proceedings.

¶ 51　　　　　　　　　　　　　III. CONCLUSION

¶ 52　Defendant's petition is not one that lacks an arguable basis in law or fact, and therefore it cannot be considered frivolous or patently without merit. For the foregoing reasons, we reverse the judgment of the trial court and remand for second-stage proceedings.

¶ 53　Reversed and remanded.